IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 18, 2016 Session

**STATE OF TENNESSEE v. DAVID G. JENKINS**

**Appeal from the Circuit Court for Franklin County**
**No. 2013-CR-93     Thomas W. Graham, Judge**
_____

**No. M2016-00270-CCA-R3-CD – Filed April 21, 2017**
_____

The Defendant, David G. Jenkins, appeals his conviction of first degree premeditated murder for which he received a sentence of life imprisonment. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction; (2) the trial court erred in admitting post-mortem photographs of the victim; (3) the trial court improperly commented on the evidence in front of the jury; (4) the trial court erred in limiting defense counsel's cross-examination of a witness; (5) the trial court erred in its rulings on various hearsay evidence; (6) the trial court erred in denying the Defendant's request to give his own closing argument to the jury; and (7) reversal is warranted due to the cumulative effect of the errors. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Paul D. Cross (at trial and on appeal) and Howell G. Clements (at trial), Monteagle, Tennessee, for the appellant, David G. Jenkins.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Mike Taylor, District Attorney General; and Steve Blount and Courtney Lynch, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The evidence presented at trial established that the victim, Corey Matthews, was a member of the Aryan Nation and was serving as a confidential informant for law enforcement. After other members of the Aryan Nation learned of the victim's actions,

the Defendant and his co-defendants, Todd Dalton, John Corey Lanier, and Coty Holmes drove the victim to a remote location where they beat the victim. Mr. Lanier used a knife to cut an "X" over the victim's Aryan Nation tattoo on his abdomen. The Defendant then struck the victim on the head and face multiple times with a ball-pein hammer, resulting in the victim's death.

## FACTS AND PROCEDURAL HISTORY

### The State's Proof

Mrs. Amanda Matthews, the victim's wife, testified that at the time of the victim's death on Saturday, March 23, 2013, they and their two-year-old daughter were living in Cowan, Tennessee. The victim's truck needed repairs, so they were renting a red Chevrolet Impala. On March 23, the victim left in the Impala between noon and 2:30 p.m. and told Mrs. Matthews that he would not be gone long.

The victim returned home between 7:00 and 7:30 p.m. with Mr. Dalton. Mrs. Matthews looked outside and saw the Impala and Mr. Dalton's white Chevrolet Z71 truck. She also saw the Defendant, Mr. Lanier, and Mr. Holmes standing around the truck. Mrs. Matthews knew Mr. Dalton, Mr. Lanier, and Mr. Holmes but had never met the Defendant. Mrs. Matthews said that the victim and Mr. Dalton were members of the Aryan Nation and that Mr. Holmes and Mr. Lanier were associated with the gang.

The victim retrieved a black portfolio from a desk and gave it to Mr. Dalton. Mrs. Matthews stated that the portfolio contained tattoo stencils, Aryan Nation symbols, and information regarding the Aryan Nation's rules, its members, the ranks of the members, and their telephone numbers. The victim, the Defendant, and the three co-defendants left in Mr. Dalton's truck.

When the victim did not return that night, Mrs. Matthews began calling the victim and sending him text messages, but he did not respond. Her calls went to the victim's voicemail. When the victim did not return the next morning, Mrs. Matthews called Mr. Dalton and then the police. Mrs. Matthews filed a missing persons report and learned of the victim's death later that afternoon.

On cross-examination, Mrs. Matthews testified that the victim was comfortable with Mr. Dalton and voluntarily entered Mr. Dalton's truck. Mrs. Matthews never heard the victim being threatened.

Mr. Coty Holmes, one of the co-defendants, testified that in exchange for his truthful testimony, he reached an agreement with the State in which he would plead

guilty to aggravated assault, robbery, and kidnapping. Under the agreement, he would receive an effective sentence of fifteen years, with three years to be served in confinement and the remainder to be served on probation. He denied that his agreement with the State influenced his testimony at trial. He said he received the offer from the State several months after he was jailed on the charges.

Mr. Holmes testified that he met Mr. Dalton and Mr. Lanier while incarcerated at the Coffee County Jail on prior offenses. Mr. Holmes said Mr. Dalton was a member of the Aryan Nation and drove a white Z71 GMC pickup truck. Mr. Holmes met the Defendant on a few occasions at Mr. Dalton's home and said that it appeared the Defendant and Mr. Dalton knew each other well. The Defendant did not indicate to Mr. Holmes whether he was affiliated with an Aryan organization.

Approximately two weeks prior to the victim's death, Mr. Holmes attended a meeting of the Aryan Nation and began "prospecting," the process by which a person becomes a member of the Aryan Nation. Mr. Dalton sponsored Mr. Holmes, which Mr. Holmes said meant that if Mr. Dalton "calls and needs … me [to] come do something, I go." Mr. Holmes said he did not have a "patch," or a "tattoo letting everyone know that you're affiliated" with the Aryan Nation.

Mr. Holmes testified that on March 23, 2013, at approximately 10:00 a.m., Mr. Dalton called him and asked that Mr. Holmes come to his shop. Mr. Holmes learned that the victim was to be kicked out of the Aryan Nation because the victim had been serving as an informant for law enforcement. Mr. Holmes said he understood that the victim would receive a "beat-out" and that the victim's "patch" or tattoo would be "covered." Mr. Holmes explained that the victim's tattoo would either be cut or covered with another tattoo. Mr. Holmes said the Defendant was present during the conversation about what was to happen to the victim.

The Defendant arrived at Mr. Dalton's shop at approximately 1:00 p.m., and the Defendant, Mr. Dalton, and Mr. Holmes drank beer and moonshine. Mr. Dalton had several vehicles in his shop that he was repairing, including the Defendant's vehicle. Mr. Dalton, Mr. Holmes, and the Defendant left the shop around 3:00 or 3:30 p.m. in Mr. Dalton's truck. Mr. Holmes said that before they left, the Defendant retrieved a ball-pein hammer from the back of his truck. The Defendant sat in the front seat, and Mr. Holmes sat in the back seat behind Mr. Dalton. They went to Mr. Lanier's home located approximately five miles away, and Mr. Lanier got into the backseat of Mr. Dalton's truck with Mr. Holmes. They then went to the Hilltop Market, a convenience store, and purchased beer.

The four men went to Tractor Supply in Winchester, Tennessee, to meet the victim. They waited thirty to forty-five minutes for the victim to arrive. Upon arriving, the victim got into the backseat of Mr. Dalton's truck with Mr. Lanier and Mr. Holmes. They drove to the home of a friend of the victim, where Mr. Dalton purchased tires for his truck. They remained at the home for thirty to forty-five minutes. They went to a convenience store to purchase beer and cigarettes and then returned to Tractor Supply where the victim's car was parked.

Mr. Holmes testified that the victim and Mr. Lanier got into the victim's car and that Mr. Lanier drove the victim's car because the victim did not have a driver's license. They went to the victim's home where Mr. Dalton planned to retrieve an item from the victim. Upon arriving at the victim's home, the victim and Mr. Dalton entered the home and remained for approximately ten to fifteen minutes. All five of the men then got into Mr. Dalton's truck. Mr. Holmes turned off his cellular phone, and Mr. Dalton placed it in the glove compartment of his truck. Mr. Holmes believed everyone turned off their cellular phones and put them away.

Mr. Dalton drove to a cemetery located approximately ten to fifteen minutes from the victim's home. Mr. Holmes stated that he had been drinking alcohol all day and that while he was not "completely drunk," he "had a good buzz." He did not recall anything about the road leading to the cemetery. Upon arriving, everyone got out of the truck and stood at the back of the truck while drinking beer.

Mr. Holmes testified that the victim was pushed into him and that they "tangled up, threw a couple of punches, [and] went to the ground." Mr. Holmes said that he punched the victim "a couple of times" and that while the victim was lying on the ground, the other four men hit and kicked the victim "a couple of times." Someone then pulled up the victim's shirt, and Mr. Lanier used Mr. Holmes's pocketknife to cut the victim's tattoo. Mr. Holmes said that at that point, the victim was "[j]ust beat up a little bit."

Mr. Holmes testified that the Defendant retrieved a ball-pein hammer from the back of Mr. Dalton's truck and began hitting the victim in the head with it. Mr. Holmes said he, Mr. Lanier, and Mr. Dalton yelled at the Defendant to stop. Mr. Holmes stated that the Defendant hit the victim five or six times, stopped, and then resumed hitting the victim five or six more times. Mr. Holmes also stated that the victim was making a "snoring, half choking" noise. Mr. Holmes said that once he, Mr. Lanier, Mr. Dalton, and the Defendant got back into the truck, the Defendant acted excited and told Mr. Holmes and Mr. Lanier that they "had earned [their] bones."

- 4 -

Mr. Holmes testified that he was shocked and did not "exactly know what to think or how to feel about it." They returned to Manchester, Tennessee, where the Defendant purchased beer at Tops, a convenience store. Mr. Holmes stated that the Defendant was "acting like nothing happened." The Defendant had blood on his arms and stated that "the lady in the store looked at him like he was crazy because he had blood on his arms."

Mr. Holmes said they went to Fire Lake in Coffee County where they threw a pocketknife and the victim's cellular phone into the water. Mr. Holmes stated that because they knew that they would be questioned about the victim's disappearance, they agreed to state that they last saw the victim after dropping him off at the Bullpen Market in Cowan. Mr. Holmes did not know what happened to the Defendant's hammer. They remained at Fire Lake for thirty to forty-five minutes. At some point, Mr. Holmes retrieved his cellular phone, and they returned to Mr. Lanier's house. Mr. Holmes and Mr. Dalton then returned to Mr. Dalton's house.

Mr. Holmes stated that Mr. Dalton owned a trailer on Mr. Dalton's property where a man named "Shorty" lived. Mr. Holmes and Mr. Dalton went to the trailer, and Mr. Dalton told "Shorty" what occurred.

Mr. Holmes testified that he was first contacted by the police early Monday morning following the victim's death on Saturday. He told the officers essentially the same story that he and the other men decided to tell while at Fire Lake. Approximately one week later, officers came to Mr. Holmes's home and transported him to the jail where he gave a detailed statement about what occurred. After speaking to the police, Mr. Holmes was released and fled to Florida. He explained, "I just didn't want to be arrested and go to jail at that exact time."

On cross-examination, Mr. Holmes testified that he was initially charged with first degree murder relating to the victim's death and that the State offered an agreement whereby he would plead guilty to kidnapping, robbery, and aggravated assault. Mr. Holmes had two prior convictions for theft of property valued more than $1,000 and a prior burglary conviction. After Mr. Holmes fled, he remained in Florida for one month.

Mr. Holmes acknowledged sending a text message to Felicia Phillips, with whom he was romantically involved, at 11:01 a.m. on March 23, 2013, stating that he had to go to the home of Mr. Dalton or "Iron Wings" because they had something they had to do. Mr. Holmes explained that while he knew that Mr. Dalton wanted Mr. Holmes to accompany him, Mr. Holmes did not know exactly what Mr. Dalton needed him to do. Mr. Holmes agreed that he told police officers that he first learned that the victim would be beaten during the drive from Tractor Supply to the victim's home, and Mr. Holmes

acknowledged that this statement was untruthful. Mr. Holmes said Mr. Dalton assisted him financially and paid him to complete tasks around Mr. Dalton's shop.

Mr. Holmes acknowledged that he was untruthful in his initial statement to police officers. He did not mention to the police officers that he and Mr. Dalton went to "Shorty's" home. Mr. Holmes acknowledged that he did not tell the officers "exactly everything that happened." He told the officers that the victim was unconscious when the Defendant hit the victim with a hammer and that he and the other men yelled at the Defendant to stop. Mr. Holmes said his hand was sore after the victim was beaten. He told the officers that his hand was sore from tying steel and working on a car. He also told the police officers that Mr. Dalton told Mr. Lanier what to do and that Mr. Holmes followed suit.

Mr. Holmes stated that he told the police officers that the Aryan Nation would ensure that he would not survive prison. Mr. Holmes explained that at the time, Mr. Lanier was an "enforcer" for the Aryan Nation and that the members were upset because Mr. Holmes, a nonmember, was present when the victim was killed.

Mr. John Cory Lanier testified that he was incarcerated on charges of first degree premeditated murder and felony murder for the victim's death. He said he reached an agreement with the State in which he would receive a fifteen-year sentence of which he would serve three years in confinement in exchange for his testimony at the Defendant's trial.

Mr. Lanier said he met Mr. Dalton and Mr. Holmes while they were incarcerated on prior offenses. Mr. Lanier attended an Aryan Nation meeting a few weeks prior to the victim's death. The Defendant told Mr. Lanier that he was associated with the Aryan Brotherhood. Mr. Lanier had met the victim on two prior occasions and knew that he was a member of the Aryan Nation. Mr. Lanier said he was told of the plan to remove the victim from the Aryan Nation shortly before the victim was beaten. Mr. Lanier maintained that at the time, he did not know why the victim was being removed from the gang. Mr. Lanier had been to the homes of Mr. Dalton and "Shorty" in the days leading up to the victim's death.

Mr. Lanier testified that as he was returning from work in Murfreesboro, Tennessee, on the day of the victim's death, Mr. Holmes called him and asked what he had planned for the evening. Mr. Lanier told Mr. Holmes that he would probably stay home. Mr. Holmes, Mr. Dalton, and the Defendant were waiting for Mr. Lanier in Mr. Dalton's truck when Mr. Lanier returned home. Mr. Lanier said Mr. Holmes, Mr. Dalton, and the Defendant had been drinking alcohol. They were going to Winchester to purchase tires and asked Mr. Lanier to go with them because Mr. Lanier was the only one

who had a valid driver's license. Mr. Lanier agreed to go and sat in the backseat of Mr. Dalton's truck. The Defendant sat in the front passenger seat. They went to Tractor Supply in Winchester to meet the victim who was supposed to accompany them to the home of the person from whom Mr. Dalton had planned to purchase tires. Mr. Lanier believed that on the way to Tractor Supply, they stopped at a convenience store and purchased a twelve pack of beer. Upon arriving at Tractor Supply, the victim got into Mr. Dalton's truck, and they went to a house in Estill Springs to purchase tires. They remained at the house for at least one hour. They then returned to Tractor Supply to retrieve the victim's vehicle. Mr. Lanier was not sure whether they purchased beer along the way and said they stopped two or three times that night to purchase beer.

Mr. Lanier testified that upon returning to Tractor Supply, they decided to go to the victim's home. The victim asked Mr. Lanier to drive his car back to his home because he had a blinker light or taillight out and did not have a valid driver's license. Mr. Lanier said the men stated that they "were going to hang out for a little bit and talk about some stuff." Mr. Dalton, Mr. Holmes, and the Defendant followed Mr. Lanier and the victim to the victim's home. Upon arriving, Mr. Lanier gave the victim the keys to his vehicle. The victim and Mr. Dalton entered the victim's home, and Mr. Lanier got into Mr. Dalton's truck with the Defendant and Mr. Holmes. At some point, Mr. Lanier turned off his cellular phone and put it in the glovebox of Mr. Dalton's truck.

Mr. Lanier stated that the men initially planned to go to a rock quarry upon leaving the victim's home. The victim said that they would not be able to access the rock quarry because it was blocked off but that they could go to his family's cemetery located about a quarter of a mile from his home to talk.

Mr. Lanier testified that upon arriving at the cemetery, the victim got into the front seat with Mr. Dalton to roll a marijuana cigarette while everyone else got out of the truck. When Mr. Dalton and the victim got out of the truck, Mr. Dalton told the victim, "You [have] been talking to the police. You know what that means." Mr. Lanier said the victim began "back peddling" and yelling at Mr. Dalton, while the Defendant and Mr. Holmes went after the victim. Mr. Dalton pushed Mr. Lanier from behind and told him to "get" the victim, so Mr. Lanier tackled the victim. Mr. Lanier said he hit the victim twice. When the other men began kicking the victim, Mr. Lanier got up, and Mr. Dalton instructed him to retrieve a utility blade from the console of the truck. When Mr. Lanier returned with the blade, Mr. Dalton instructed him to "X" out the victim's tattoo. The utility blade was knocked out of Mr. Lanier's hand, and he was unable to find it because it was dark outside. Mr. Holmes gave Mr. Lanier a pocketknife, which Mr. Lanier used to "X" across the victim's chest three times. The men then began kicking the victim in the head and stomping him.

- 7 -

Mr. Lanier testified that they left the victim and got into the truck to leave. Mr. Dalton started the ignition, turned the truck off, and said, "F this. I'm not going to jail over this." Mr. Lanier said he and Mr. Holmes got out of the backseat of the truck and ran around to the front of the truck where Mr. Lanier saw Mr. Dalton and the Defendant standing over the victim. Mr. Lanier heard Mr. Dalton yell out and saw the Defendant hit the victim in the head with a ball-pein hammer. Mr. Lanier said the Defendant hit the victim with the hammer three or four times. Mr. Lanier yelled at the Defendant to stop, and the Defendant finally stopped hitting the victim. Mr. Dalton, the Defendant, Mr. Lanier, and Mr. Holmes then got into the truck and left. Mr. Lanier said that while driving away, Mr. Dalton was talking on his cellular phone, and the Defendant told Mr. Lanier and Mr. Holmes, "Don't look at me weird. This is just how I am."

Mr. Lanier testified that the victim was conscious when Mr. Lanier cut him and was semi-conscious and making sounds before the Defendant struck him with the hammer. Mr. Lanier did not see from where the Defendant retrieved the hammer and said the Defendant did not have the hammer when they first got out of the truck at the cemetery.

Mr. Lanier stated that they returned to Manchester where he believed that the Defendant purchased more beer at a convenience store. They then went to Fire Lake where they "washed up" and discussed what they would say happened to the victim. Mr. Lanier said they agreed that if someone asked, they would state that they last saw the victim when they dropped him off at the Bullpen Market in Cowen. Mr. Lanier did not see the Defendant with the ball-pein hammer at Fire Lake and did not know what happened to the hammer. Mr. Lanier said the pocketknife and the victim's cellular phone were thrown into the lake. Mr. Lanier's cellular phone was returned to him, and Mr. Dalton drove Mr. Lanier back home.

Police officers first contacted Mr. Lanier around 1:00 or 2:00 a.m. on Monday morning following the victim's death on Saturday. Mr. Lanier told the officers that he last saw the victim when Mr. Lanier, Mr. Dalton, Mr. Holmes, and the Defendant dropped off the victim at the Bullpen Market in Cowan. Approximately one month later, while Mr. Lanier was jailed on the charges related to the victim's death, he gave a statement to the police which was consistent with his testimony at trial. At that time, Mr. Lanier did not tell the officers that he cut the victim's chest but provided this information to the officers approximately one week later. Mr. Lanier said he provided the information before he reached a deal with the State regarding his pending charges and maintained that his agreement with the State did not influence his testimony at trial.

On cross-examination, Mr. Lanier acknowledged that he had a prior conviction for obtaining precursor drugs by false pretenses and two other drug-related convictions. He

said that while he had an issue with drugs during most of his life, he was not using drugs during his association with the Aryan Nation.

Mr. Lanier said he was a "regular member" of the Aryan Nation and was not an "enforcer." He left the gang following the victim's death. He said the Defendant was a member of the Aryan Brotherhood and not the Aryan Nation. A few days prior to the victim's death, Mr. Lanier attended a meeting at the home of "Shorty" and Tabatha Roulette Jones. Mr. Lanier attended one formal meeting of the Aryan Nation during which rankings were discussed. The victim said he was an "enforcer" with the gang, which Mr. Lanier believed meant that the victim ensured that people followed the rules. Mr. Lanier said a member who violated the rules of the Aryan Nation could have his tattoo removed.

Mr. Lanier acknowledged that his initial statement to the police was not true. He also acknowledged that approximately one month later, he lied to the police when he told them that Mr. Holmes cut the victim's chest. Mr. Lanier stated that the Defendant had blood and brain matter on him when he purchased beer at the convenience store following the victim's death. Mr. Lanier saw a statement from Mark Luttrell in his discovery received from the State in which Mr. Luttrell admitted to ordering Mr. Dalton to remove the victim's tattoo or "patch."

On redirect examination, Mr. Lanier testified that when he was a member of the Aryan Nation, he believed that "blood out," during which a member was removed from the gang, meant that the member was beaten and not that the member was killed. Mr. Lanier did not recall the Defendant saying anything about the blood and brain matter on him upon returning from purchasing beer following the victim's death.

Ms. Tabatha Jones testified that in March 2013, she and Christopher "Shorty" Bryan were renting a trailer from Mr. Dalton located next to Mr. Dalton's home. Ms. Jones said Mr. Bryan, Mr. Dalton, and the victim were members of the Aryan Nation. Mr. Lanier was a new member, and Mr. Holmes was a "prospect." Ms. Jones had attended a meeting of the Aryan Nation, and members gathered at her residence at times.

Ms. Jones stated that on Friday, March 22, 2013, Mr. Dalton came to her home and began calling other members of the Aryan Nation to come over, including Mr. Lanier. When the members arrived, Mr. Bryan produced his tattoo kit and said they were planning to cover up the victim's Aryan Nation tattoo or "patch." Mr. Dalton said the victim was "narcing." Ms. Jones said it appeared that Mr. Bryan was going to cover the victim's Aryan Nation tattoo with another tattoo. She stated that when a member's tattoo is "taken," there is also a "beat down" or a physical fight. She also stated that in her experience, the member is not killed during the "beat down."

Ms. Jones testified that on March 23 between 9:00 and 11:00 p.m., she was sleeping when Mr. Dalton came to her home. She stated that Mr. Dalton appeared to have been drinking alcohol and was talking "[b]ig" as if he was "[e]mpowered by something." Ms. Jones testified that as she was lying in bed, she overheard Mr. Dalton tell Mr. Bryan that Mr. Dalton, Mr. Lanier, Mr. Holmes, and the Defendant kicked and beat the victim for about twenty minutes while in a cemetery. Mr. Dalton stated that as they were getting ready to leave, the Defendant jumped out of the truck and grabbed a ball-pein hammer. Mr. Dalton said he instructed the Defendant to kill the victim. Mr. Dalton stated that the victim had two cellular phones, which they "snapped" in half and threw into the river.

Ms. Jones testified that after Mr. Dalton left, Mr. Bryan sat down on the side of the bed and began crying. She explained that she and Mr. Bryan did not contact the police because they hoped that it was not true and that they were scared. Ms. Jones learned of the victim's death the following day and contacted the Franklin County Sheriff's Office. Ms. Jones stated that Mr. Bryan later died at the age of thirty-two after an "ex-Aryan Nation gave him a pill."

Ms. Jones testified that she had seen the Defendant a few times with Mr. Dalton at her home and at Mr. Dalton's garage. She said the Defendant and Mr. Dalton appeared to be "best friends." She had heard that the Defendant was a member of the Aryan Brotherhood. She stated that while the Aryan Brotherhood and the Aryan Nation shared the same ideas, the Aryan Brotherhood was more violent and believed "blood in, blood out."

On cross-examination, Ms. Jones testified that the Defendant did not attend the meeting at her home the day before the victim was killed. The Defendant was not with Mr. Dalton when Mr. Dalton came to Ms. Jones's home following the murder. Rather, Mr. Lanier was with Mr. Dalton, and Ms. Jones saw blood on Mr. Lanier's sleeves and shirt around his stomach. Ms. Jones never saw the Defendant at an Aryan Nation meeting. She did not believe that a member of the Aryan Brotherhood was supposed to attend a "beat out" of an Aryan Nation member.

Investigator Brad Weaver with the Cowan Police Department testified that during the months prior to the victim's death, the victim provided him with information related to theft and drug cases that he was investigating. As a result of the victim's death, Investigator Weaver was unable to "make any cases" using the information that the victim provided.

Investigator George Dyer with the Franklin County Sheriff's Office testified that the victim was a confidential informant for him from the fall of 2012 until December

2012 or early 2013. As a result of the information that the victim provided, Investigator Dyer prosecuted crimes involving guns, theft, methamphetamine manufacturing, and marijuana cultivation. The victim was compensated as a result of his assistance. Investigator Dyer said he stopped using the victim as a confidential informant because the victim became careless about whom he told of his assisting Investigator Dyer and about assisting other officers. Investigator Dyer told the victim that the victim's actions were dangerous and could result in the victim's death.

Mr. Shelby Stewart, who once worked with the victim, testified that on March 23, 2013, the victim called him about parts to an automobile that Mr. Stewart was selling. The victim informed Mr. Stewart that he knew someone who was interested in purchasing the parts. Between 4:15 p.m. and 6:00 p.m. that evening, the victim came to Mr. Stewart's home located between Winchester and Tullahoma, Tennessee, in a white GMC pickup truck with four other men. There were two older men and two younger men. One of the older men was the driver of the truck and purchased the parts from Mr. Stewart. The other older man was wearing a pair of tan Carhartt pants and an orange or reddish orange shirt.

Mr. Stewart said that the victim and the other men remained at his house for approximately one hour and that the victim was not acting in any unusual way. The other four men were laughing amongst themselves and "cutting up." Mr. Stewart said the men had been drinking alcohol and threw away an empty box of beer at Mr. Stewart's shop.

In March 2013, Ms. Tina Stephens lived on Slagtown Road, a gravel road in Cowan, Tennessee, near Jackson Cemetery. Ms. Stephens testified that her father was buried in the cemetery and that she mowed the cemetery and watched over it to prevent vandalism. Ms. Stephens said that on March 23, 2013, at approximately 7:30 p.m., she was traveling down the gravel road when she saw lights at the cemetery and a white truck exiting the cemetery as she passed by. She did not see who was inside the truck.

Officer Mike Holmes with the Cowan Police Department testified that on March 24, 2013, the dispatcher called him to take a missing person's report from Mrs. Matthews regarding the victim. Mrs. Matthews told Officer Holmes that Mr. Dalton had picked up the victim, and she gave him Mr. Dalton's cellular phone number. Officer Holmes called Mr. Dalton and spoke to him and prepared a report.

Officer Holmes testified that after preparing the report, he began driving around and ended up at Jackson Cemetery, a secluded area near the victim's home where people would go to think or fight. Officer Holmes found the victim's body in a cut cornfield approximately thirty yards from the gravel road that separated the cemetery and the cornfield. The victim was wet because it had been raining. His shirt was pulled up, and

Officer Holmes saw a tattoo on the victim's abdomen that had been crossed out with a knife or razor blade. The victim's eyes were black and swollen shut, and he had a large laceration and a round dent in his head. Officer Holmes was unable to identify the victim due to the condition of his face but said the victim's clothing matched the description of the clothing that Mrs. Matthews said the victim was wearing when she last saw him.

Investigator Brian Brewer with the Franklin County Sherriff's Office testified that he was called to the scene where he saw the victim's body lying in a wet cornfield that had been cut. He said it was a very wet and windy day. He observed several wounds to the victim's head and said that the tattoo on the victim's chest had been crossed out with a sharp object. Investigator Brewer saw three blood stains close to the victim's body and a Keystone Light beer can three or four feet away from the victim's head.

Investigator Brewer stated that the investigation led officers to develop the Defendant, Mr. Dalton, Mr. Lanier, and Mr. Holmes as those who were with the victim on Saturday, March 23, 2013, prior to his death. Investigator Brewer spoke to Mr. Dalton two days later and gained access to his white GMC Z71 pickup truck. Investigator Brewer observed Keystone Light beer cans in the back of Mr. Dalton's truck that matched the beer can found at the scene. Upon opening the door of the truck, Investigator Brewer smelled a strong odor of bleach that appeared to have been coming from the floorboard. He said the odor was "so strong it would almost burn your nose." He observed bleach stains on the floorboard and decided to have the truck transported to the crime laboratory of the Tennessee Bureau of Investigation (TBI). TBI Special Agent Chip Andy took a few swabs from the interior of the truck prior to its transportation to the crime laboratory.

During the course of the investigation, officers obtained videotapes of the Defendant, Mr. Dalton, Mr. Holmes, and Mr. Lanier recorded by several convenience stores on March 23. At 4:06 p.m., the Defendant, Mr. Holmes, and Mr. Lanier entered the Hilltop Market in Manchester, purchased beer, and left in Mr. Dalton's truck. The Defendant was wearing an orange shirt, but officers were never able to locate the shirt. At 6:45 p.m., Mr. Dalton's truck drove up to the SAK-N-PAK Market in Estill Springs, and the Defendant, Mr. Dalton, Mr. Holmes, Mr. Lanier, and the victim exited the truck. Mr. Lanier purchased a twelve-pack of Keystone Light beer. Investigator Brewer said that while he received information that the Defendant and the co-defendants stopped at another convenience store to purchase beer after killing the victim, he was unable to place any of the men at a particular convenience store during that time period.

Investigator Brewer also brought in divers to search the lake for the victim's property and a knife used to cut the victim. However, the divers were unable to locate the items.

On cross-examination, Investigator Brewer said he attempted to familiarize himself with the Aryan Nation as a result of the case. He said he was told that Mark Luttrell was the state president and that Mr. Dalton was the vice president of the area. Investigator Brewer stated that while he interviewed Mr. Luttrell at the jail and at Mr. Luttrell's home, he had since been unable to locate Mr. Luttrell. Mr. Luttrell told Investigator Brewer that he ordered Mr. Dalton to complete the "beat down" of the victim. Mr. Luttrell also said that the members of the Aryan Nation were upset that two "non-brothers" were present when the victim was killed.

On redirect examination, Investigator Brewer testified that he also began learning about the Aryan Brotherhood during the course of his investigation. He noted that the Aryan Nation and the Aryan Brotherhood were similar organizations.

Special Agent Hunter Green, a forensic scientist assigned to the TBI's latent print unit, testified that she dusted a 2001 GMC Sierra for fingerprints but was unable to raise any identifiable latent prints. She was not surprised that she was unable to raise any fingerprints on the outside of the truck because precipitation could wash away parts of the fingerprint residue, leaving fragmented prints that would not be of any value. She stated that portions of the inside of the truck were textured or cloth and were not suitable surfaces for obtaining latent prints. She also stated that any action in wiping down the truck could destroy a fingerprint.

Special Agent Charly Castelbuono, a forensic biologist with the TBI, testified that the victim's blood was on the front passenger's side door around the area of the speaker of Mr. Dalton's truck. She noted that the truck smelled of bleach or some kind of cleaning agent and that there was discoloration on the floorboard. The beer can found near the victim's body had a saliva mixture of two DNA profiles around the mouth area with the victim as the major contributor. Special Agent Castelbuono never received an orange shirt for testing.

Special Agent Michael Frizzell with the TBI's technical services unit analyzed the cellular phone records of the Defendant, his co-defendants, and the victim for March 23, 2013. Special Agent Frizzell noted that between 2:35 and 4:31 p.m., the victim's cellular phone was in an area near his residence. Between 5:08 and 5:55 p.m., the victim's cellular phone was in the Winchester area. The victim's cellular phone did not register with a cellular tower after 6:31 p.m. Special Agent Frizzell said that as a result, the victim's cellular phone was either turned off or was in an area where a signal could not be received. All inbound calls received after 6:31 p.m. went to the victim's voicemail.

Special Agent Frizzell testified that in addition to Mr. Lanier's cellular phone records, he also had Mr. Lanier's real time trip data (RTT), which the agent used to

determine the approximate location of Mr. Lanier's cellular phone. Mr. Lanier's cellular phone was in the Manchester area around 4:10 p.m. Mr. Lanier's cellular phone was not registered with a cellular tower between 4:10 and 9:30 p.m., which Special Agent Frizzell said meant that the phone was either turned off or was not receiving a signal. During that time period, calls to Mr. Lanier were going straight to voicemail. At 9:30 p.m., Mr. Lanier's cellular phone registered at a site around the Lake Normandy and Fire Lake area. At 10:30 p.m., his cellular phone registered at a site near his home.

Special Agent Frizzell testified that according to Mr. Dalton's cellular phone records, Mr. Dalton did not turn off his cellular phone on the day of the victim's death. Mr. Dalton's cellular phone was around Cowan at 5:08 p.m., around the Winchester/Decherd area at 5:30 p.m., in the area where the victim was killed close to 8:00 p.m., in the area of Normandy Lake and Fire Lake between 9:06 and 9:16 p.m., and in the area where Mr. Dalton's home was located at 10:19 p.m.

According to Mr. Holmes's cellular phone records, his cellular phone was in the Manchester area at 4:13 p.m. His cellular phone was turned off until 8:03 p.m. At 9:28 p.m., the cellular phone was using a cell tower near Normandy Lake and Fire Lake.

Special Agent Frizzell testified that according to the Defendant's cellular phone records, the network did not register after 10:10 a.m. The agent said the Defendant's cellular phone was either turned off or in a "dead spot."

Dr. David Zimmerman, a forensic pathologist and a medical examiner, conducted the autopsy of the victim's body. Dr. Zimmerman testified that although the exact time of death could not be determined, he believed that the victim died on either Saturday, March 23 or Sunday, March 24, based upon his examination. The victim was seventy inches tall and weighed 155 pounds. His teeth were in very poor condition, and he had a metabolite of hydrocodone, methamphetamine, amphetamine and alprazolam in his blood. Dr. Zimmerman did not see any defensive wounds to the victim's hands.

Dr. Zimmerman noted fourteen separate lacerations to the victim's head and face as a result of blunt force trauma. The lacerations included an "L" shaped laceration on the right side of the victim's scalp. Dr. Zimmerman said ten of the blows were likely significant enough to have caused the victim's death. The victim had a depressed skull fracture on the back of the head behind the right ear and on the forehead and a fracture of the frontal bone. Dr. Zimmerman found bruises on multiple areas of the brain and a laceration on the underside of the right portion of the brain.

The victim's right eye was ruptured, and the ethmoid and nasal bones were fractured. The victim had contusions on the back of the head and on the neck and

abrasions on the left side of the scalp and face, between the eyebrows, on the nose, on the right side of the scalp and face, and under the lower lip. Dr. Zimmerman noted that there was blood in the victim's neck around the right carotid artery and that the hyoid bone was fractured. The victim had abrasions on the stomach, back, and right leg. He had two bruises on the right upper back and bruising and swelling on the back of the left forearm. The victim had scratches in the pattern of an "X" over a tattoo on his abdomen. Dr. Zimmerman said the cuts on the victim's abdomen usually would not have resulted in death.

Dr. Zimmerman concluded that the cause of the victim's death was multiple blunt force injuries and that the manner of death was homicide. He said a hammer could have caused the fourteen blows to the victim's head and face.

On cross-examination, Dr. Zimmerman testified that two lacerations were "L" shaped and were not consisted with the "round part" of a hammer. He stated that if an "L" shaped piece of metal were used, he would expect abrasions on both sides of the laceration.

Dr. Zimmerman stated that the contusions on the victim's lower neck and the fracture of the hyoid bone were consistent with the victim being choked. He stated that the injuries could be consistent with the victim making a gurgling noise while in the process of dying or becoming unconscious. He acknowledged that the swelling on the victim's left forearm could have been a defensive wound.

On redirect examination, Dr. Zimmerman testified that a hammer with a flat face usually would not have caused the "L" shaped injuries. He stated that the edge of a flat object could have caused the "L" shaped lacerations. He also stated that had the victim been hit with any straight portion of a ball-pein hammer, it could have caused the "L" shaped lacerations.

Dr. Zimmerman testified that the contusion to the forearm could have been caused by someone punching or kicking the area. He said the abrasions around the victim's neck and the neck fracture could have been caused by someone kicking, punching, or holding the victim tight to the ground. He also said that the victim did not die as a result of the neck fracture.

Dr. Zimmerman said the injuries to the brain could have injured the back of the nose and mouth, causing bleeding into the airway. He stated that the bleeding into the airway could have caused a gurgling sound.

Investigator Todd Hindman with the Franklin County Sheriff's Office testified that he interviewed the Defendant at the Coffee County Sheriff's Department on March 25, 2013. Investigator Hindman told the Defendant that he had information that the Defendant was one of the last people who were with the victim prior to the victim's death. The Defendant consented to the search of his truck, which was at the Coffee County Sheriff's Department. Investigator Hindman said the Defendant's clothes were "packed" in trash bags in the truck.

Investigator Hindman attempted to locate the Defendant after he was indicted on charges related to the victim's death on April 8, 2013. The Defendant never returned to retrieve his last check from his employment. On May 2, 2013, Investigator Hindman learned that the Defendant's truck had been located in a parking lot at a store in New Boston, Texas. Officers in Texas reviewed a video from the store's video surveillance system that was recorded approximately four weeks before the truck was found. The video showed a person matching the Defendant's description briefly entering the store and then abandoning the truck. In September 2013, the Defendant was apprehended in Hobbs, New Mexico.

Ms. Sharon Boyd, the general manager at TitleMax in Manchester, Tennessee, testified that on March 25, 2013, she loaned $700.00 to the Defendant against his 1994 Chevrolet pickup truck. The Defendant never returned to make a payment on the loan.

Ms. Lisa Lotz, who lived in Hobbs, New Mexico, testified that she met the Defendant when a friend dropped her off at the Defendant's home in New Mexico. She knew the Defendant for two or three weeks. Ms. Lotz stated that the Defendant told her that he had murdered a man and that he was "America's most wanted." The Defendant told Ms. Lotz that when he returned to prison, he would have the name of the man who he killed tattooed on his body with the names of seven other people that were already tattooed on his body. The Defendant said he was not ready to return to prison but knew that he would eventually be required to do so. The Defendant informed Ms. Lotz that he was ordered to kill the man by the "Aryan Brothers" and that he killed the man in a cornfield in Tennessee.

Ms. Lotz testified that while she initially believed that the Defendant was "joking," she believed that the Defendant's claims might be true as time passed, and she became scared of the Defendant. The Defendant told Ms. Lotz that he would kill anyone who reported him to the authorities. Ms. Lotz reported the Defendant to law enforcement, who investigated the Defendant and informed Ms. Lotz that he was wanted for murder. She said that she was scared of the Defendant and did not want him to hurt her but that she returned to the Defendant's home. She waited until he was asleep and then left. She was later notified of the Defendant's arrest by law enforcement.

Ms. Lotz testified that she received a reward of $200 from law enforcement in Hobbs and $2,500 from the TBI as a result of the Defendant's arrest. She said she was unaware that there was a reward for information leading to the Defendant's arrest. She maintained that she reached out of law enforcement because she was afraid of the Defendant. On cross-examination, Ms. Lotz testified that a friend who was taking methamphetamine introduced her to the Defendant. She said both she and the Defendant used drugs. She also said she stopped methamphetamine "way after" receiving the reward money.

Ms. Lotz stated that she knew the Defendant for approximately forty-eight hours before the Defendant told her about the murder. She was not surprised that the Defendant barely knew her before confiding in her about the murder. She explained, "My mother always told me I took after my great grandmother, I can find out your life story in five minutes." She said she saw the Defendant's tattoos of the other names and that they were "in like a code type deal."

Ms. Lotz recalled speaking to a defense investigator and telling him that she was not going to attend the Defendant's trial because she did not want to see the Defendant. On cross-examination, Ms. Lotz testified that the defense investigator told her to "keep moving" so that she did not have to attend trial.

Mr. Josh Russell, an inmate at the Bedford County Jail, testified that when he was incarcerated in December 2013, the Defendant was an inmate at the jail and that they were both assigned to the lockdown unit. After they were incarcerated together for one or two months, the Defendant told Mr. Russell about the murder and laughed about it. Mr. Russell said the Defendant told him "[m]ore or less good riddance to a snitch." The Defendant stated that he was a member of the Aryan Brotherhood, that Mr. Dalton was the vice president of the Aryan Nation, and that Mr. Lanier and Mr. Holmes were "prospects." The Defendant said he and Mr. Dalton were good friends. Mr. Russell said that based on his understanding, the head of the Aryan Nation, who was incarcerated, sent an order to a man they called "Luttrell Cornbread" that the victim be killed. Mr. Luttrell then told Mr. Dalton to carry out the order.

The Defendant told Mr. Russell that the plan was to cut off the victim's tattoo and kill him. According to the Defendant, Mr. Dalton brought him along to ensure "things went right" because Mr. Holmes and Mr. Lanier were only "prospects." The Defendant stated that the victim was killed near a cemetery. He told Mr. Russell that Mr. Holmes and Mr. Lanier helped cut the victim's tattoo and beat him but that they did not kill him. The Defendant said that Mr. Holmes and Mr. Lanier were "being p******, so he took over" and that Mr. Dalton told him to kill the victim. The Defendant stated that he hit the

victim several times with a ball-pein hammer. Because the victim was still gurgling, the Defendant believed that the victim was still alive and hit the victim with the hammer until the victim stopped making noises. The Defendant said that he threw the hammer into a lake and that Mr. Dalton, Mr. Holmes, and Mr. Lanier agreed to state that they were changing the tires on Mr. Dalton's truck if anyone asked where they were that night.

The Defendant told Mr. Russell that the police officers never found anything inside of his home because he did not go home after killing the victim. Rather, he showered and changed his clothes at his girlfriend's house. The Defendant said that police officers asked him to come to the sheriff's office for an interview, that during the interview, he denied any knowledge of how the victim died, and that the officers allowed him to leave. The Defendant told Mr. Russell, "I can't believe they let me walk out of there." The Defendant stated that after leaving the sheriff's office, he obtained a loan from TitleMax and began driving toward Mexico.

Mr. Russell testified that he was incarcerated for a pending charge of sale and delivery of a Schedule IV drug. He stated that he did not have a firm agreement with the State on the resolution of his charges in exchange for his testimony at trial.

On cross-examination, Mr. Russell testified that while he did not receive any promises from the State in exchange for his testimony, his sentencing hearing on his charge was postponed until after he testified at the Defendant's trial. Mr. Russell was originally charged with selling drugs in a school zone, but that charge was dismissed. He previously had been charged with escape after missing a head count at a halfway house. He had three prior convictions for drug trafficking in Kentucky. Mr. Russell maintained that he did not know anything about the victim's death until the Defendant told him about it.

**Defense Proof**

Detective Chad Partin with the Coffee County Sheriff's Department assisted Franklin County investigators in interviewing suspects, including the Defendant. Detective Partin did not recall taking a formal statement from the Defendant. Detective Partin recalled telling the Defendant during the interview that he did not believe that the Defendant was the killer. Detective Partin told the Defendant, "I think one man in the group is putting you other three in a bad position, his name is Todd Dalton."

On cross-examination, Detective Partin testified that he made the statement to the Defendant in an effort to obtain an acknowledgment from the Defendant of his role in the murder. Detective Partin said he did not actually believe that the Defendant was innocent.

Investigator George Dyer with the Franklin County Sheriff's Office testified that he also interviewed the Defendant. Investigator Dyer told the Defendant that he did not believe that the Defendant killed the victim and told the Defendant to "get it off [his] chest." On cross-examination, Investigator Dyer testified that he made the statement in an effort to persuade the Defendant to discuss the events. Investigator Dyer believed that the Defendant was involved in the victim's death.

The parties entered into a stipulation regarding a series of text messages between Mr. Dalton and the Defendant on the day of the victim's death during which they discussed Mr. Dalton repairing the Defendant's truck. The parties stipulated that Mr. Holmes sent a text message to Ms. Alicia Phillips earlier that day stating that he had to hurry to Mr. Dalton's house because they had something that they needed to "take care of." Mr. Holmes then sent Ms. Jamie Brazelton a text message later that night in which he stated that they "just got done doing what we had to do" and that he had broken his hand.

The defense recalled Investigator Brewer, who testified regarding his interviews of Mr. Mark Luttrell on March 25, 2013. Mr. Luttrell acknowledged that members of the Aryan Nation were "blessed in." If members broke the rules of the Aryan Nation, they were beaten, and their Aryan Nation tattoos or "patches" were covered up. Mr. Luttrell stated that Conley Fair sent word to him that the victim's tattoo needed to be covered and that Mr. Luttrell told Mr. Dalton on Friday night prior to the victim's death to cover the victim's tattoo. Mr. Luttrell said Mr. Dalton told him that Mr. Dalton attempted to persuade the victim to leave his home, that the victim said he was coming over, and that the victim never came. Mr. Luttrell stated that he gave Mr. Conley this information and that Mr. Conley told him to "deal with it." Mr. Luttrell said he had been in charge of the Aryan Nation in that area for three years, that he had ordered the tattoos of some members to be covered, and that no one had died as a result.

The Defendant was originally charged with first degree premeditated murder and felony murder in the perpetration of especially aggravated kidnapping. The trial court granted a directed verdict on the felony murder charge. The jury convicted the Defendant of first degree premeditated murder. The trial court sentenced the Defendant to life imprisonment to be served consecutive to his sentence for a prior offense.

## ANALYSIS

On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction; (2) the trial court erred in admitting post-mortem photographs of the victim; (3) the trial court improperly commented on the evidence in front of the jury; (4) the trial court erred in limiting defense counsel's cross-examination of a witness; (5) the

trial court erred in its rulings on various hearsay evidence; (6) the trial court erred in denying the Defendant's request to give his own closing argument to the jury; and (7) reversal is warranted due to the cumulative effect of the errors.

## I.    SUFFICIENCY

The Defendant contends that the evidence is insufficient to establish premeditation as an element of first degree premeditated murder.  When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Therefore, this court will not re-weigh or reevaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).  "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

First degree murder is the premeditated and intentional killing of another.  T.C.A. § 39-13-202(a)(1).  A premeditated act is one "done after the exercise of reflection and judgment." *Id*. § 39-13-202(d).  Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*.  The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id*. at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id*. Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id*. Mutilation of the body may show that a killing was not rash or impulsive. *Davidso*n, 121 S.W.3d at 615. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

The evidence presented at trial established that Mr. Dalton called Mr. Holmes to come to his shop on the day of the victim's death because Mr. Dalton needed his assistance. Upon arriving, Mr. Holmes learned of the plan to remove the victim from the Aryan Nation. The Defendant and Mr. Dalton were good friends, and the Defendant was present when the plans regarding the victim were discussed. Before they left Mr. Dalton's shop to meet the victim, the Defendant retrieved a ball-pein hammer from his truck.

The Defendant and the co-defendants waited until they were at a remote location before confronting the victim about his role as an informant. They then beat the victim, and Mr. Lanier cut the victim's Aryan Nation tattoo with a pocketknife. The victim was lying on the ground, was unarmed, and was in a semi-conscious state. Rather than leave the victim, the Defendant produced the ball-pein hammer and struck the victim multiple times over the head and face with the hammer. The Defendant then stopped. Upon hearing the victim make a gurgling sound, the Defendant began striking the victim with the hammer again and continued to do so until the victim was no longer making noises. Dr. Zimmerman noted fourteen different blows to the victim's head and face. Dr. Zimmerman opined that ten of the blows were of such force that each could have individually resulted in the victim's death.

After killing the victim, the Defendant, along with his co-defendants, drove away and stopped at a convenience store to purchase beer. The Defendant acted excited and told Mr. Holmes and Mr. Lanier that they had "earned their bones." When the Defendant returned from the convenience store where he purchased beer, he joked about the blood on him and the look that he received from the cashier due to the blood. The Defendant and his co-defendants went to a lake where they disposed of the victim's cellular phone and the pocketknife. They agreed to a story that they would tell if questioned about the victim's disappearance. At some point, Mr. Dalton's truck was cleaned with cleaning solution. The Defendant told Mr. Russell that he went to his girlfriend's house to shower and dispose of his clothing.

The Defendant boasted of killing the victim to Mr. Russell and Ms. Lotz. The Defendant told Ms. Lotz that he was ordered to kill the victim by the "Aryan Brothers." The Defendant admitted to Mr. Russell that he was aware that the victim was to be killed because he was a police informant. The Defendant told Mr. Russell that the plan was to cut off the victim's tattoo and to kill the victim and that Mr. Dalton brought the Defendant along to ensure "things went right." We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish premeditation as an element of first degree premeditated murder. The Defendant is not entitled to relief regarding this issue.

## II. ADMISSION OF PHOTOGRAPHS

The Defendant contends that the trial court erred in admitting two photographs of the victim's body taken at the scene. He argues that the photographs were gruesome and inflammatory and that other evidence of the victim's injuries was presented at trial. The State responds that the trial court did not abuse its discretion in admitting the photographs. We agree with the State.

Tennessee courts follow "a policy of liberality" regarding the admission of photographs as evidence during a criminal trial. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). In order to admit the photographs, the trial court must first determine whether the photographs are relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. If the photograph is relevant, the trial court must next determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 951. "Unfair prejudice" is defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm.

Note).  The trial court possesses the sound discretion to determine the admissibility of photographs and will not be overturned on appeal absent a clear showing of an abuse of discretion.  *Id*. at 949.

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect."  *State v. Brock*, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009).  Factors to be considered in determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Banks*, 564 S.W.2d at 951.  "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror."  *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (citation omitted).

During the testimony of Investigator Brewer, the State sought to admit two photographs of the victim taken at the crime scene.  One photograph showed the victim's abdomen where his Aryan Nation tattoo had been crossed out with a knife.  The other photograph was a close-up of the injuries to the victim's head and face.  The prosecutor argued that the photographs were relevant to reflect the victim's multiple injuries and to support the testimony of Mr. Holmes and Mr. Lanier.  The prosecutor stated that while more graphic photographs were taken, he was not seeking to admit those photographs.

The trial court found that the photographs were relevant to the issue of the instrument used, the impact of the instrument, and how it caused the victim's death.  The trial court noted that while the photographs were gruesome, "this was a gruesome event" and that the photographs "have a purpose."  The trial court did not allow the State to display the photographs for everyone in the courtroom to see.  Rather, the State was only allowed to pass the photographs to the jury once they were admitted into evidence.  The trial court also gave a curative instruction to the jury as requested by the Defendant.

We conclude that the trial court did not abuse its discretion in admitting the two photographs.  The photographs were probative of the nature and extent of the victim's injuries and probative of the issue of premeditation.  *See Adams*, 405 S.W.3d at 663 (recognizing repeated blows as a factor in determining the existence of premeditation);

*Bland*, 958 S.W.2d at 660 (listing the particular cruelty of the killing as a factor supporting the existence of premeditation). During the trial, the Defendant challenged the credibility of the testimony of Mr. Holmes and Mr. Lanier and the evidence of the Defendant's role in the victim's death. The Defendant also questioned Dr. Zimmerman on cross-examination regarding the instrument used to cause some of the victim's injuries to his head and face. The photographs supported the testimony of Mr. Holmes and Mr. Lanier regarding how and where the injuries occurred, as well as evidence presented regarding the nature and extent of the injuries.

The Defendant argues that the photographs were cumulative to the testimony of Dr. Zimmerman and his illustration of the victim's injuries. However, the Tennessee Supreme Court has recently recognized that "'[p]hotographs of a corpse are admissible in murder prosecutions if they are relevant to the issue at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used.'" *State v. Willis*, 496 S.W.3d 653, 728 (Tenn. 2016) (quoting *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011)). "Thus, the fact that the State could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs." *Id.*

Enlarged images of the photographs were not shown on a projector during the trial. Rather, the photographs were passed around to the jurors after they were admitted into evidence. The trial court also granted the Defendant's request for a curative instruction regarding the nature of the photographs.

In admitting the photographs, the trial court noted that while the photographs were gruesome, the nature and circumstances of the homicide were also gruesome. "In determining whether any prejudice to the defendant was unfair, the trial court could fairly take into account the grotesque and horrifying nature of the conduct charged." *Id.* at 729. "'Insofar as the photographs tend to be shocking or gruesome, it is because the crime depicted is of that sort.'" *Id.* (quoting *State v. Sandles*, 740 S.W.2d 169, 177 (Mo. 1987) (en banc)).

The primary purpose of the photographs was not to "elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror." *Collins*, 986 S.W.2d at 20 (citation omitted). Rather, the photographs were relevant to the issue of the nature and extent of the victim's injuries and the issue of premeditation and to support the testimony of Mr. Holmes and Mr. Lanier, which the Defendant vigorously challenged during the trial. The Defendant failed to establish that the probative value of the photographs was substantially

outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in admitting the photographs at trial.

### III. COMMENT ON THE EVIDENCE

The Defendant contends that the trial court improperly commented on the evidence at trial and that, as a result, the trial court should have granted the Defendant's motion for a mistrial.

Defense counsel asked Ms. Lotz on cross-examination whether she recalled speaking to Mr. Jim Hardy. Ms. Lotz said she told Mr. Hardy that she did not want to attend trial because she did not want to see the Defendant. Defense counsel asked Ms. Lotz whether Mr. Hardy was a "pretty nice guy," and Ms. Lotz said Mr. Hardy seemed to be a nice man. On redirect examination, the prosecutor asked Ms. Lotz whether Mr. Hardy told her "to keep moving so [she] didn't have to show up to court today," and Ms. Lotz confirmed that Mr. Hardy made the statement.

At the conclusion of Ms. Lotz's testimony, the following proceedings occurred in front of the jury:

> THE COURT: That being the case, Mr. Hardy will not ever get anything in this court if that proves to be the case. He will never—
>
> [MS. LOTZ]: He should have it recorded.
>
> THE COURT: --be approved for an investigator so I don't know who he is, or what he is, but he better not say something like that. We'll determine that later on. All right, let's wrap it up. There's not much …
>
> MR. CLEMENTS: Well, Judge, he's here …
>
> THE COURT: That's something –
>
> MR. CLEMENTS: I hate to leave it on this, because there's no way
>
> THE COURT: Well, I'm just—there's nothing we can do about that now, but I mean, if that were, in fact, true –
>
> MR. CLEMENTS: If he did it, certainly, but if he did it, if he did it Paul Cross and I wouldn't have hired him. Let me state that.

THE COURT: All right, I understand that. I'm not accusing y'all of being unethical. That particular statement, if it was made, would be unethical, that's for sure.

The trial court then adjourned for the night.

The next morning, defense counsel moved for a mistrial based upon the trial court's comments in front of the jury. Defense counsel argued that the trial court made an improper comment on the evidence that led the jury to believe that the court accredited Ms. Lotz's testimony. The trial judge found that he "didn't say that it absolutely had happened" but only said that "if it became clear to the Court that that was the case, that that person would be barred from ever dealing with this court." The trial court also found that the comment did not result in prejudice to the Defendant and denied the motion for a mistrial.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Article VI, section 9 of the Tennessee Constitution provides that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." This provision aims to avoid giving "the jury any impression as to [the judge's] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989). "These purposes are accomplished by preventing the trial court from ... commenting on the weight of the evidence[] or instructing the jury concerning the factual conclusion to be drawn from the evidence." *State v. Odom*, 928 S.W.2d 18, 32 (Tenn. 1996). It has been held previously that when a trial court improperly comments on the evidence, appellate courts "must consider the trial court's comment in the overall context of the case to determine whether the comment was prejudicial." *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004) (citing *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993)). However, because it is a non-structural constitutional error, it is subject to harmless error review. *See State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008); *see also State v. Alvin Brewer*, No W2012-02281-CCA-R3-CD, 2014 WL 1669807, at *14 (Tenn. Crim. App. Apr. 24, 2014) (analyzing improper comments as non-structural constitutional error), *abrogated on other grounds by State v. Willie*

*Duncan*, 505 S.W.3d 480 (Tenn. 2016). If error is established, the State then bears the burden of establishing that the error was harmless beyond a reasonable doubt. *Rodriguez*, 254 S.W.3d at 371. The test used to determine whether a non-structural constitutional error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999); *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002)) (internal quotation marks omitted).

We conclude that in making the statements, the trial judge improperly conveyed to the jury his feelings toward Ms. Lotz's testimony that an investigator hired by the defense suggested that she move in order to avoid service of a subpoena to testify at trial. Such comments could be viewed as imputing the investigator's alleged improper behavior to defense counsel. While this court understands the trial court's concerns regarding allegations that an investigator for the Defendant encouraged a State's witness to avoid a subpoena, the trial court should have expressed those concerns outside the presence of the jury.

Nevertheless, we conclude that the error was harmless beyond a reasonable doubt. Both Mr. Holmes and Mr. Lanier testified that the Defendant killed the victim by hitting him in the head and face with a ball-pein hammer. The victim's blood was found on the front passenger side of Mr. Dalton's truck where the Defendant had been sitting. The Defendant made statements to both Ms. Lotz and Mr. Russell admitting his involvement in the victim's death. In light of the overwhelming evidence of the Defendant's guilt, we hold that the trial court's improper comments were harmless beyond a reasonable doubt.

## IV. LIMITING CROSS-EXAMINATION

The Defendant maintains that by instructing defense counsel to "wrap it up" during his cross-examination of Ms. Lotz, the trial court erroneously limited the defense's cross-examination of Ms. Lotz in violation of the Defendant's constitutional rights. The Defendant asserts that the "gist" of the trial court's comment "seems to be that it was taking too long. This is inadequate as a reason for curtailing cross-examination."

Defense counsel conducted an extensive cross-examination of Ms. Lotz. Defense counsel questioned Ms. Lotz as to why the Defendant would share the details of the victim's death and the prior murder that he had committed with her after knowing her for a short period of time. Defense counsel also questioned Ms. Lotz about whether she had seen the Defendant's tattoos that she maintained reflected the seven prior murders that he had committed and whether she was able to recall the details about the tattoos. Defense counsel asked Ms. Lotz about her drug use and suggested that she used the reward money she received for reporting the Defendant to law enforcement to purchase drugs.

- 27 -

Defense counsel then returned to questioning Ms. Lotz about why the Defendant would confide in her about the murders.  Ms. Lotz explained that both men and women were attracted to her and that she could "find out your life story in five minutes." Defense counsel asked Ms. Lotz whether there were other occasions during which she met someone "on short notice and they revealed to [her] intimate things," and Ms. Lotz affirmed that "[q]uite a few" people had revealed details to her.  She testified that a man whom she had known for three hours told her that he had stolen a vehicle outside of his home.  Defense counsel asked Ms. Lotz whether she had spoken to either of the prosecutors, and Ms. Lotz affirmed that she had talked to "him."  The following proceedings occurred:

Q      Did you get to them?

A      Why would I?

THE COURT:  Well, this is getting a little bit—

A      Why would I?

. . . .

A      Why would I?  They're law enforcement.

THE COURT:  I've given you a lot of leeway—

A      Why would I want to find out their lives?

THE COURT:  Wait just a minute, ma'am, wait just a minute.

Now, listen, this could go on all night.  Big funny, but you know, you've done a pretty good amount of cross-examination, so let's wrap this up.

Q      Okay.  Well, you've done that practically everybody you—

A      No, sir.

Q      Well, most people like you, is that true?

A      Yes, Sir.

- 28 -

Q       And most people will tell you the most intimate secrets of their life within a short period of time?

A       Yes, sir, I guess.

[DEFENSE COUNSEL]:  Okay, that's all.

Although the Defendant claims that the trial court violated his right to cross-examine Ms. Lotz, the Defendant did not raise this constitutional claim at trial. Accordingly, this issue is waived.  *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").  Regardless of waiver, the Defendant is not entitled to relief.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992) *superseded by statute as stated in State v. Reid*, 91 S.W.3d 247, 306 n.13 (Tenn. 2002).  However, "'[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)).  Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation."  *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997) (stating that a defendant's right to confront and cross-examine witnesses "does not mean that a defendant has a right to present irrelevant evidence").  "The propriety, scope, manner and control of the cross-examination of witnesses … rests within the sound discretion of the trial court."  *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).  This court will not disturb the limits that a trial court has placed upon cross-examination unless the trial court has unreasonably restricted the right.  *Id.*

The record reflects that the trial court did not unreasonably restrict the Defendant's right to cross-examine witnesses.  Defense counsel questioned Ms. Lotz extensively about her statement that the Defendant informed her of the details of the victim's death and his commission of other murders after knowing each other for a short period of time. Defense counsel also explored on cross-examination Ms. Lotz's claims that she could learn a person's life story shortly after meeting the person.  Defense counsel then began

questioning Ms. Lotz regarding whether she spoke to the prosecutors and was able to learn information about them. The trial court correctly noted that this line of questioning whereby defense counsel asked Ms. Lotz what she was able to learn about everyone with whom she spoke in connection with the investigation "could go on all night." This line of questioning was at most "marginally relevant" in light of defense counsel's prior cross-examination of Ms. Lotz. Moreover, the Defendant fails to identify any area of cross-examination that he would have pursued had the trial court not encouraged defense counsel to "wrap it up." Accordingly, the Defendant is not entitled to relief regarding this issue.

## V.  HEARSAY

The Defendant contends that the trial court erred in admitting Ms. Jones's testimony regarding statements that she overheard Mr. Dalton make to her husband about the details of the victim's death. The Defendant maintains that Mr. Dalton's statements were inadmissible hearsay and that the trial court erred in finding that Mr. Dalton's statements qualified as statements against interest pursuant to Tennessee Rule of Evidence 804(b)(3). The Defendant next asserts that the trial court erred in excluding his statements that he made to law enforcement as inadmissible hearsay. Finally, the Defendant argues that the trial court erred in excluding statements by Mark Luttrell as inadmissible hearsay.

Our supreme court has recently addressed the appropriate standard of review to be employed for a trial court's ruling on hearsay evidence as follows:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule – are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (citations omitted).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802.

## A. Admission of Mr. Dalton's Statements

During a jury-out hearing, the State argued that Mr. Dalton's statements constituted either statements of a co-conspirator pursuant to Rule 803(1.2)(E) or statements against interest pursuant to Rule 804(b)(3). The trial court found that Mr. Dalton's statements did not qualify as statements of a co-conspirator. The prosecutor stated that Mr. Dalton's counsel was present at the trial and that counsel informed the prosecutor that Mr. Dalton would invoke his Fifth Amendment rights and refuse to testify if called as a witness at the Defendant's trial. The trial court found that Mr. Dalton was unavailable and that his statements qualified as statements against interest pursuant to Rule 804(b)(3).

A "statement against interest" is defined as:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability …, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Tenn. R. Evid. 804(b)(3). Our supreme court reasoned that a statement against penal interest is sufficiently reliable to constitute an exception to the hearsay rule because

"a reasonable person similarly situated to the declarant would not have made the statement unless the reasonable person believed it was true. In turn, this statement means that a reasonable declarant would have realized it was against his or her interest. The important time is when the statement was made.

Rule 804(b)(3) does not specifically provide that the declarant must have personally known that the statement was against his or her interests when it was made. However, this knowledge is the reason the hearsay statement is viewed as sufficiently reliable to be admitted, and *the evidence should not be admitted if it is established that the declarant did not know that the statement was harmful.*"

- 31 -

*State v. Kiser*, 284 S.W.3d 227, 265 (Tenn. 2009) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.36(5) (5th ed. 2005)) (emphasis in original). "'For example, if the declarant actually believed that he or she was saying something that would be helpful, reliability is questionable and the statement should not be admitted under this hearsay exception.'" *State v. Greta Cooper*, No. E2011-00590-CCA-R3-CD, 2012 WL 950103, at *6 (Tenn. Crim. App. Mar. 20, 2012) (quoting Cohen, *supra* § 8.36(5)).

The Defendant does not challenge the trial court's finding that Mr. Dalton was unavailable to testify at trial. *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (holding that once the declarant asserted his Fifth Amendment privilege against self-incrimination, the declarant became "unavailable" for purposes of Tennessee Rule of Evidence 804). Rather, the Defendant argues that Mr. Dalton made the statements to a fellow member of the Aryan Nation with no expectation that Ms. Jones would overhear the conversation and with no "perception that his statements [would] expose him to criminal liability." The Defendant also argues that the fact that Mr. Dalton's statements "might accidentally expose him is not consistent with the logic of the rule, because it is the knowingly exposing oneself to criminal sanctions which supplies the necessary reliability."

The Defendant relies upon the Tennessee Supreme Court's opinion in *State v. Kizer*, 284 S.W.3d 227 (Tenn. 2009). In *Kiser*, the Tennessee Supreme Court addressed the issue of whether a statement by an anonymous declarant could constitute a statement against penal interest. 284 S.W.3d at 264-66. Citing cases from other jurisdictions, the court agreed with the reasoning that the statement of an anonymous declarant does not tend to expose the declarant to criminal liability because the declarant is unknown. *Id.* at 265-67 (citing *State v. Artis*, 384 S.E.2d 470, 484-85 (N.C. 1989), *vacated on other grounds by Artis v. North Carolina*, 494 U.S. 1023 (1989)). "'It is only where the identity of the declarant is revealed in the statement that the guarantee of reliability arises. The statement must actually subject the declarant to criminal liability. Without knowledge of the identity of the declarant, the statement does not subject declarant to criminal liability.'" *Id.* at 266-67 (quoting *Artis*, 384 S.E.2d at 484-85).

The present case, however does not involve the statement of an anonymous declarant. Moreover, contrary to the Defendant's contention, a statement made to a person whom the declarant trusts and with no expectation that the statement will be overheard by someone else does not fall outside the parameters of Rule 804(b)(3). Rather, we view such circumstances as enhancing the reliability of the statements. Mr. Dalton stated that he participated in beating the victim and instructed the Defendant to kill the victim. A reasonable declarant would have realized that admitting to his participation in the beating and killing of another was against his or her penal interest.

We conclude that Mr. Dalton's statements so far tended to subject him to criminal liability that a reasonable person in his position would not have made the statements unless the person believed it was true. *See* Tenn. R. Evid. 804(b)(3). The trial court properly admitted Mr. Dalton's statements as statements against his penal interest.[1]

### B. Exclusion of the Defendant's Statement to Law Enforcement

At trial, the Defendant sought to present a portion of his statement to an investigator during an interview on March 25, 2013. The portion of the statement provided as follows:

> INTERVIEWER: Saturday, how'd y'all meet him?
>
> [DEFENDANT]: I've been trying to put a transmission in my truck for about two and a half weeks, put three of them in there and I was down at my friend's shop working on my tranny … and he had to go pick up some tires and he said, "Look nobody can be here when I'm not here. My wife don't like it. You're welcome to ride with me. We get back, we'll tinker with your tranny some more."

The trial court questioned whether the defense would be able to introduce the statement absent the Defendant testifying at trial. Defense counsel argued that the Defendant's statement should be admitted under the state of mind hearsay exception in Tennessee Rule of Evidence 803(3). Defense counsel also argued that Mr. Dalton's statement as reflected in the Defendant's statement was not hearsay. The trial court found that the state of mind hearsay exception did not apply because the Defendant's statement related to his recollection of events after they had occurred and were "subject to all manner of fraud." The trial court also found that the Defendant's statement was self-serving and, therefore, inadmissible.

On appeal, the Defendant maintains that his statement is admissible pursuant to Tennessee Rule of Evidence 803(3) as a statement of "then existing state of mind, emotion, sensation or physical condition." He asserts that the statement was necessary to show that he "had no choice but to leave with Dalton and Holmes when they left the shop" to meet with the victim. The Defendant also maintains that Mr. Dalton's statement that was included in the Defendant's statement is effectively a command and, therefore, is not hearsay. The State responds that the Defendant's statement was self-serving and

---

[1] We note that the Defendant did not claim that the admission of Mr. Dalton's statement violated the Defendant's confrontation rights. Accordingly, we do not address the issue.

did not fall within the state of mind hearsay exception in Rule 803(3). We agree with the State.

Generally, a defendant may not introduce self-serving statements without testifying. *See, e.g., State v. King*, 694 S.W.2d 941, 945 (Tenn. 1985). As the Tennessee Supreme Court has stated:

> "A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at this trial to show his innocence."

*Id.* (quoting *Hall v. State*, 552 S.W.2d 417, 418 (Tenn. Crim. App. 1977)). However, "'no general rule of evidence excludes statements merely because they are self-serving. Instead, most self-serving statements are excluded … because they constitute inadmissible hearsay.'" *State v. Eric Williams*, No. W2013-01593-CCA-R3-CD, 2015 WL 1453389, at *13 (Tenn. Crim. App. Mar. 27, 2015) (quoting *Tony A. Phipps v. State*, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496 (Tenn. Crim. App. Oct. 11, 2010)); *see* Cohen, supra § 8.08[3][a] n.405 (6th ed. 2011) (stating that "[t]he self-serving nature of the statement is immaterial under … most hearsay exceptions").

Tennessee Rule of Evidence 803 contains exceptions to the rule against hearsay, including the declarant's then existing state of mind. This exception allows the admission into evidence of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed …." Tenn. R. Evid. 803(3). This exception makes admissible "declarations of mental state ... to prove mental state at issue or subsequent conduct consistent with that mental state." Tenn. R. Evid. 803(3), Advisory Comm'n Cmt. Hearsay statements under the exception may not be admitted to prove past conduct. *Id.* "To qualify for this exception, 'the statement must be one made at the time of the event in question.'" *State v. Warner Conrad Bias*, No. E2007-01452-CCA-R3-CD, 2009 WL 3817291, at *17 (Tenn. Crim. App. Nov. 16, 2009) (quoting *State v. Mike Lafever*, No. M2003-0506-CCA-R3-CD, 2004 WL 193060 (Tenn. Crim. App. Jan. 30, 2004)).

The Defendant argues that his statement was "an assertion of his discomfort or acquiescence to that discomfort in leaving the shop, or, more to the point, his discomfort in hanging around when his presence was not wanted and violated Dalton's rule." However, nothing in the Defendant's statement suggested any discomfort on the part of

the Defendant and does not reflect the Defendant's state of mind. Rather, the Defendant's statement is a "statement of memory or belief" made two days after the victim's murder in order to "prove the fact remembered." *See* Tenn. R. Evid. 803(3). Accordingly, the Defendant's statement did not qualify under the state of mind hearsay exception, and the trial court properly excluded the statement. *See Warner Conrad Bias*, 2009 WL 3817291, at \*16-18 (holding that the defendant's statements during an interview with police was not admissible pursuant to the state of mind hearsay exception when the defendant made the statements almost three days following the murder).

## C. Mark Luttrell's Statements

The Defendant contends that the trial court erred in excluding portions of Mr. Luttrell's statements to law enforcement. According to the Defendant, the statements were admissible under either the statement against interest hearsay exception in Tennessee Rule of Evidence 804(b)(3) or the state of mind hearsay exception in Rule 803(3).

During the trial, the Defendant sought to present statements that Mr. Luttrell made to law enforcement officers during two interviews. The Defendant argued that the statements were admissible as statements against interest pursuant to Rule 804(b)(3) and that some of the statements may be admissible under the state of mind hearsay exception in Rule 803(3). Both the State and the defense acknowledged that they had not been able to locate Mr. Luttrell and serve him with a subpoena to testify at trial.

The trial court found that Mr. Luttrell was unavailable for purposes of Rule 804. The trial court then reviewed the transcripts of Mr. Luttrell's interviews with various officers and determined whether the statements were admissible as statements against interest pursuant to Rule 804(b)(3). The trial court found that the following statements by Mr. Luttrell during the first interview were admissible as statements against interest: Mr. Luttrell acknowledged that Aryan Nation members were "[b]lessed in" and then "beat[en] out" with their "patch" covered if the member violated the rules, that Conley Fair contacted him and told him that the victim's "patch" needed to be covered, and that Mr. Luttrell instructed Mr. Dalton to cover the victim's "patch." The trial court found that the following statements by Mr. Luttrell during the second interview were admissible as statements against interest: (1) Mr. Luttrell spoke to Mr. Dalton on Friday night prior to the victim's death the next day and that Mr. Dalton told him that Mr. Dalton attempted persuade the victim to come to his home that night in order to cover the victim's "patch" but that the victim never came; (2) when Mr. Luttrell spoke to Mr. Fair about the victim's status as an informant, Mr. Fair told Mr. Luttrell to "deal with it"; and (3) Mr. Luttrell had been head of the Aryan Nation in the area for three years and that he had ordered "[a] few" "patches" to be covered.

- 35 -

The trial court found that the following statements by Mr. Luttrell during the first interview did not qualify as statements against interest and, therefore, were not admissible: (1) when asked to give the name of someone, Mr. Luttrell responded, "But if I give y[ou] a name, … I'm screwed"; (2) Mr. Luttrell referred to someone as the third person in command and then corrected himself by stating that the other two people who ranked above this person "passed away, been beat out and covered up"; and (3) when asked what the worst thing that he had done, Mr. Luttrell responded that he had "[w]hoop[ed] people" and acknowledged that he was like an enforcer. The trial court found that the following statements by Mr. Luttrell during the second interview did not qualify as statements against interest: (1) Mr. Luttrell's explanation as to how he learned of the victim's death and his reaction and (2) his statements identifying those who informed him and Mr. Fair of the victim's status as a police informant.

The Defendant challenges the trial court's decision to disallow the various statements by Mr. Luttrell. However, in the Defendant's supplemental motion for new trial in which he raised the issue, the Defendant stated that the trial court "erred in excluding Luttrell's statements of fear, including but not limited to 'If I give you the names, I'm screwed.'" Furthermore, during the hearing on the motion for new trial, defense counsel only argued that the trial court erred in excluding this one statement. As a result, the Defendant's challenges to the other statements made by Mr. Luttrell that were excluded by the trial court are waived. *See* Tenn. R. App P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in ... [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").

While the Defendant argues that Mr. Luttrell's statement, "But if I give y[ou] a name, … I'm screwed," falls within the statement against interest and the state of mind exceptions, defense counsel argued during the hearing at the motion for new trial that "I think it clearly comes in not as a statement against interest, but as a statement of fear, which is the mental state exception to the hearsay." Accordingly, the Defendant has waived his claim that Mr. Luttrell statement constituted a statement against interest pursuant to Rule 804(b)(3). *See* Tenn. R. App. P. 3(e).

Mr. Luttrell's expression of fear falls within the state of mind hearsay exception in Tennessee Rule of Evidence 803(3). The Defendant argues that this statement was relevant to explain that the Defendant fled to New Mexico following the victim's murder due to fear of retaliation by the Aryan Nation. No evidence was presented at trial that the Defendant fled to New Mexico due to fear of retaliation by the Aryan Nation, and Mr. Luttrell's statement does not support the Defendant's claim. Accordingly, Mr. Luttrell's statement was irrelevant and was properly excluded from the trial. *See* Tenn. R. Evid. 401.

## VI.    RIGHT TO SELF-REPRESENTATION

The Defendant states that the trial court erred in denying his request to present his own closing argument, which resulted in the denial of his right to self-representation. The State responds that the trial court properly denied the Defendant's untimely request. We agree with the State.

Prior to closing arguments, defense counsel informed the trial court that the Defendant would like to present his own closing argument. The trial court addressed the Defendant's request as one to discharge counsel and proceed pro se during closing arguments. The trial court found that the request was not timely, explaining:

> We've gone through a very complicated trial and it's a serious case, and in a few minutes, actually, before final argument, ask to be able to represent yourself is just not a timely request.
>
> Other case law also says that the criminal defendant has a constitutional right to effective assistance of counsel and the constitutional right to represent himself. He may not be forced to accept the service of counsel, and by implication he must make a choice between self-representation and representation by counsel, so the choice was made long ago, and in fact, as recently as yesterday the defendant chose not to testify in the case, which is not exactly the same thing, I guess, as counsel, but it does point that how late the request is made, and I just believe that in the interest of justice this case is best tried by continuing with counsel that's there. They're communicating with … the defendant and we should proceed in that fashion. So I'm denying the request to self-represent at this late stage in the trial.

The accused in a criminal prosecution is guaranteed the right to counsel by the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. As an alternative to that right, the accused may instead assert the right to self-representation. *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009). Clearly, both rights cannot be simultaneously asserted. *Id.* The right to self-representation is guaranteed by the same constitutional provisions which provide for the right to counsel. *Id.* "The right to represent oneself exists '[d]espite the fact that its exercise will almost surely result in detriment to both the defendant and the administration of justice.'" *State v. Robert Hood*, No. W2004-01678-CCA-R3-DD, 2005 WL 2219691, at *11 (Tenn. Crim. App. Sept. 13, 2005) (quoting *State v. Fritz*, 585 P.2d 173,177 (Wash. Ct. App. 1978)).

In order to assert the right to self-representation: "(1) a defendant must make the request in a timely manner, (2) the assertion of the right of self-representation must be clear and unequivocal, and (3) the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel." *State v. Hester*, 324 S.W.3d 1, 30-31 (Tenn. 2010); *see State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988) (reversing the defendant's convictions). Courts have generally "assigned a constitutional primacy to the right to counsel over the right of self-representation." *Hester*, 324 S.W.3d at 30. Accordingly, "[c]ourts should indulge every presumption against waiver of the right to counsel." *Lovin*, 286 S.W.3d at 287 n.15. The trial court's decision regarding the timeliness of the Defendant's request to represent himself made during trial rests within the discretion of the trial court. *See State v. Michael Lewis*, No. W2001-03121-CCA-R3-CD, 2003 WL 1697689, at *10 (Tenn. Crim. App. Mar. 26, 2003).

The State asserts that the Defendant did not make a clear and unequivocal request to represent himself and that the request was untimely. We conclude that even if the Defendant's request was clear and unequivocal, the request was untimely. The Defendant did not request to represent himself until after all of the proof had been submitted and both parties had rested. The trial was in its fourth day, and twenty-six witnesses had testified. The Defendant had previously waived his right to testify and acknowledged that he made the decision against testifying even though defense counsel advised him otherwise. Under these circumstances, the trial court properly found that the Defendant's request to represent himself was untimely. Accordingly, the Defendant is not entitled to relief regarding this issue.

## VII.   CUMULATIVE ERROR

The Defendant asserts that the cumulative effect of the errors warrants a new trial. We have held that while the trial court improperly commented on the evidence, the error was harmless beyond a reasonable doubt. The Defendant is not entitled to relief.

## CONCLUSION

Based upon our review of the record and the applicable law, we affirm the judgment of the trial court.


_____
JOHN EVERETT WILLIAMS, JUDGE